UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| Melissa Garza individually and on behalf of all others similarly situated, | 1:22-cv-03098 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Nestle USA, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Nestle USA, Inc. ("Defendant") manufactures, markets, and sells milk-based powder with iron ("infant formula") to non-infants, designated as Gerber Good Start Grow ("Product").

I. MISLEADING REPRESENTATIONS THAT GERBER GOOD START GROW IS NUTRITIONALLY APPROPRIATE

2. The American Academy of Pediatrics (AAP) recommends "exclusive breastfeeding for the first 6 months of life with the addition of complementary foods and the continuation of breastfeeding until at least 12 months of age."

3. Infant formula with added iron is the accepted alternative where breastfeeding is not an option. 21 C.F.R. § 106.3 (defining infant formula as "a food which purports to be or is represented for special dietary use for infants [0-12 months] by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk.").

4. The transition beyond the first twelve months is "critical for establishing healthy

dietary preferences and preventing obesity in children."[1]

5. Defendant's Good Start Grow, marketed for children between twelve and twenty-four months old, recognizes the importance of this period in early development.

**Nourishing toddler tummies.**

The first 18 months are the most crucial time for your little one's belly. Gerber Good Start Grow has probiotics to help support your toddler's digestive health, as well as 2'-FL Human Milk Oligosaccharide. HMO is a prebiotic just like one of those found at significant levels in breastmilk.

**The goodness inside.**

Most toddlers aren't getting the recommended amount of certain key nutrients. That's why Gerber Good Start Grow is designed with essential nutrients, like vitamins D and E, to help fill common nutrient gaps, and has DHA and iron to support brain development.



6. The formula trade group, Infant Nutrition Council of America, which includes the manufacture of Gerber Good Start Grow, stated that "transition formulas" can be used to fill nutrition gaps beyond 12 months.[2]

---

[1] Jennifer L. Harris, and Jennifer L. Pomeranz, "Infant formula and toddler milk marketing: opportunities to address harmful practices and improve young children's diets." Nutrition Reviews (2020).
[2] Olga Khazan, The Ominous Rise of Toddler Milk, Baby-formula sales are slumping, so the companies that make it have turned to supplements for 3-year-olds, December 29, 2020.

7. However, a global consensus of pediatric health organizations, including the American Academy of Pediatrics (AAP) Committee on Nutrition and the relevant Sub-Committee of the World Health Organization (WHO) reached the opposite conclusion.

8. These groups advise that beyond twelve months, children's nutritional needs should be met with whole cow's milk, water, and healthy whole foods as part of a balanced diet, and that transition formula "is not recommended."[3]

## II. DEFENDANT'S GOOD START GROW IS IDENTICAL TO ITS INFANT FORMULA EVEN THOUGH IT IS NOT RECOMMENDED FOR DIETARY NEEDS OF TARGET GROUP

9. Since 2003, rates of breastfeeding have increased significantly, resulting in a decrease in sales of infant formula.

10. To make up for declining sales of infant formulas, companies have introduced products marketed as "transition formulas," "follow-on formulas," "weaning formulas," "toddler milks," and "growing-up milks" ("GUMs") (collectively, "Transition Formulas") to children between twelve and thirty-six months old.[4]

11. U.S. Nielsen data shows advertising spending on transition formula quadrupled between 2003 and 2015, with sales increasing almost threefold.

12. Companies like Defendant capitalize on consumers' familiarity and acceptance of federally approved infant formula and continue selling it to them when their children are no longer infants, defined as zero to twelve months old.

---

[3] AAP Committee on Nutrition, 1988. Follow-on formulas follow-up or weaning formulas. Pediatrics 83, 1067 1989; World Health Organization, July 17, 2013. Information concerning the use and marketing of follow-up formula.
[4] Jennifer L. Pomeranz, Maria J. Romo Palafox, and Jennifer L. Harris. "Toddler drinks, formulas, and milks: Labeling practices and policy implications." Preventive medicine 109 (2018): 11-16 (citing American Academy of Pediatrics (AAP) Committee on Nutrition and World Health Organization (WHO) findings).

13. Defendant's Good Start Gentle Pro Infant Formula (left) is advertised and marketed in a way that is near-identical to its Good Start Grow "Toddler Drink" ("transition formula"), through common labeling formats, images, design, type size, fonts, call-outs, and graphics.



14. This State's regulations for labeling are identical to those established by the Food and Drug Administration ("FDA") and require companies to identify and describe a product in a truthful way that distinguishes it from other products.

4

15. The Infant Formula and Toddler Drink have identical statements of identity: "Milk Based Powder."

Infant Formula with Iron      Transition Formula

 

16. The identical statement of identity for the Toddler Drink fails to indicate how it is different from the Infant Formula.

17. This harms caregivers purchasing these items for children because the nutritional requirements of infants are different from children between twelve and twenty-four months.

18. The similarity of the representations continue:

| Infant Formula | Toddler Drink |
|---|---|
| 0 – 12 Months | 12 – 24 Months |
| For complete nutrition & advanced comfort | Tailored nutrition for toddlers |
| Everyday Probiotics; | Everyday Probiotics; |
| Digestive Health & immune support | Digestive Health & immune support |
| Brain & eye development; DHA | Brain development; DHA & Iron |
|  | Strong bones & teeth; Calcium & Vitamin D |
| Easy to digest – Comfort Proteins |  |
| 2' – FL; HMO Immune Support | 2' – FL; HMO Immune Support |

19. Through the similar representations, caregivers get the incorrect impression that the Gerber Good Start Grow Toddler Drink is the "next step" for children beyond infancy.

20. The identical labeling elements further this impression and ride the coattails of the

carefully regulated infant formula products to drive sales.

### III. GERBER GOOD START GROW TODDLER DRINK IS NUTRITIONALLY INCONSISTENT WITH EXPERT ADVICE

21. Child nutrition experts universally oppose consumption of added sugars by children between twelve and twenty-four months.

22. However, Gerber Good Start Grow Toddler Drink contains 15 grams of added sugar, shown on the Nutrition Facts.



6

23. The added sugars are identified in the fine print of the ingredient list as "Corn Maltodextrin" (corn syrup) and "Sugar."

**INGREDIENTS:** NONFAT DRY MILK, CORN MALTODEXTRIN, VEGETABLE OILS (HIGH-OLEIC SAFFLOWER, SOY, PALM OLEIN, AND COCONUT), SUGAR, AND LESS THAN 2% OF: POTASSIUM PHOSPHATE, CALCIUM PHOSPHATE, SOY LECITHIN, CALCIUM CITRATE, POTASSIUM CITRATE, CALCIUM CHLORIDE, MAGNESIUM PHOSPHATE, CHOLINE BITARTRATE, M. ALPINA OIL*, C. COHNII OIL**, SODIUM ASCORBATE, FERROUS SULFATE, B. LACTIS CULTURES, MIXED TOCOPHEROLS, ASCORBYL PALMITATE, ALPHA-TOCOPHERYL ACETATE, ZINC SULFATE, NIACINAMIDE, CALCIUM PANTOTHENATE, RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, VITAMIN A ACETATE, THIAMINE MONONITRATE, MANGANESE SULFATE, FOLIC ACID, BIOTIN, VITAMIN D3.

24. Even if caregivers scrutinize the packaging and discover the added sugars, they are not told that giving foods to children over twelve months with added sugars is inconsistent and contrary to their nutritional needs.[5]

25. Beyond containing added sugars, Good Start Grow contains less protein, equivalent calories and almost fifty percent more carbohydrates (sugars) than whole cow's milk.

---

[5] Maria J Romo-Palafox and JL Pomeranz et al., "Infant formula and toddler milk marketing and caregiver's provision to young children," Journal of Maternal and Child Nutrition, vol. 16,3 (2020): e12962. doi:10.1111/mcn.12962

**Nutritional Composition for 8 fl. oz.**

| Nutrient | Unit | Whole Cow's Milk | Gerber Good Start Grow Stage 3 |
|---|---|---|---|
| Energy | cal | 149 | 149 |
| Protein | g | 7.69 | 4.57 |
| Total Fat | g | 7.98 | 5.71 |
| Carbohydrate | g | 12.8 | 18.3 |

26. According to the price of the Product on third-party websites, the Product costs $17.48 per 680 grams.

27. According to the Retail Milk Price Reports of the United States Department of Agriculture ("USDA"), whole milk in Chicago costs approximately $3.85 per gallon.

28. This means Gerber Good Start Grow Stage 3 is almost four times the cost of the recommended alternative and nutritionally superior choice of whole cow's milk.[6]

| Price | Cow's (whole) | Gerber Good Start Grow Stage 3 |
|---|---|---|
| Price ($/100 g) | 0.15 | 0.59 |
| Price ($/8 fl oz) | 0.29 | 1.17 |
| Price ($/gallon) | 4.68 | 18.76 |

29. The similar labeling of the Infant Formula and Good Start Grow causes caregivers, like Plaintiff, to make inaccurate and ill-advised nutritional purchasing decisions.

30. For instance, a study of caregivers' understanding of transition formula labeling

---

[6] Consensus Statement, Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations, Robert Wood Johnson Foundation, Healthy Eating Research, Sept. 2019.

concluded that 52% expected these products to "give toddlers nutrition that they wouldn't get from other sources."[7]

31.     Public health research has shown that use of products such as Good Start Grow results in prolonged use of expensive, re-branded, infant formula instead of transitioning infants to cow's milk, water, and other healthy foods.

32.     70% of persons surveyed believed transition formulas like Good Start Grow is a suitable drink for children in this age range, despite expert opinions that they offer "no unique nutritional value beyond what could be achieved through a nutritionally adequate diet; furthermore, they contribute added sugars to diet."

## IV. CONCLUSION

33.     Defendant misrepresented the Product through affirmative statements, half-truths, and omissions.

34.     Defendant sold more of the Product and at a higher price than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

35.     Had Plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

36.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than the Product costs $17.48 per 680 grams, excluding tax, compared to other similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

---

[7] Maria J Romo-Palafox and JL Pomeranz et al., Marketing claims on infant formula and toddler milk packages: What do caregivers think they mean? , UCONN Rudd Center for Food Policy & Obesity, September 2019.

Jurisdiction and Venue

37. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

38. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

39. Plaintiff Melissa Garza is a citizen of Illinois.

40. Defendant Nestle USA, Inc. is a Delaware corporation with a principal place of business in Arlington, Arlington County, Virginia.

41. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

42. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been offered and sold for several years, with the representations described here, in the states covered by Plaintiff's proposed classes.

43. The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

44. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

45. Plaintiff Melissa Garza is a citizen of Hickory Hills, Cook County, Illinois.

46. Defendant Nestle USA, Inc. is a Delaware corporation with a principal place of business in Arlington, Virginia, Arlington County.

47. Defendant's registered agent in its state of incorporation is The Corporation Trust Company, 1209 N Orange St Wilmington DE 19801.

48. Defendant's registered agent in its state of principal place of business is C T Corporation System, 4701 Cox Rd Ste 285 Glen Allen VA 23060.

49. Defendant is synonymous with baby food, and the largest, most respected company which purports to provide nutrition to young and growing children.

50. The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

51. Plaintiff purchased the Product on at least one occasions within the statutes of limitations for each cause of action alleged, at stores including Buy Buy Baby, 290 Orland Park Pl, Orland Park IL 60462-3855 between 2020 and 2021, and/or among other times.

52. Plaintiff bought the Product because she wanted a food which was nutritionally adequate for a child between twelve and twenty-four months, as she was entrusted with a legally required duty to care for such a child.

53. Plaintiff did not expect the Product was of the type which global health bodies have criticized and condemned for the reasons herein.

54. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

55. Plaintiff bought the Product at or exceeding the above-referenced price.

56. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

11

57. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

58. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

59. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations about its adequacy, components and ingredients are consistent with its representations.

60. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar infant formulas, because she is unsure whether those representations are truthful.

## Class Allegations

61. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Iowa, Arkansas, Wyoming, North Dakota, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

62. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

63. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

64. Plaintiff is an adequate representative because her interests do not conflict with other members.

65. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

66. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

67. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

68. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act<br>("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

69. Plaintiff incorporates by reference all preceding paragraphs.

70. Plaintiff and class members desired to purchase a product which was nutritionally appropriate for a child between twelve and twenty-four months.

71. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

72. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

73. Plaintiff relied on the representations and omissions to believe the Product was nutritionally appropriate for a child between twelve and twenty-four months.

74. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

75. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

76. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

77. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

78. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

79. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

80. The Product was manufactured, identified, distributed, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it possessed functional, nutritional, organoleptic, sensory and/or qualitative attributes which it did not.

81. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

82. Defendant knew the product attributes that potential customers like Plaintiff were

seeking and developed its marketing and labeling to directly meet those needs and desires.

83. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it was nutritionally appropriate for a child between twelve and twenty-four months.

84. Defendant's representations affirmed and promised that the Product was nutritionally appropriate for a child between twelve and twenty-four months.

85. Defendant described the Product so Plaintiff and consumers believed it was nutritionally appropriate for a child between twelve and twenty-four months, which became part of the basis of the bargain that it would conform to its affirmations and promises.

86. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

87. This duty is based on Defendant's outsized role in the market for this type of Product – the most well-known baby food company, famous for its "Gerber Babies."

88. Defendant had a special duty to Plaintiff because it capitalized on its reputation in the field of infant formula, a highly regulated product, to drive sales in an unregulated area.

89. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

90. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

91. Defendant received notice and should have been aware of these issues due to complaints by regulators, academics, competitors, and consumers, to its main offices over the past several years.

92. The Product did not conform to its affirmations of fact and promises due to Defendant's actions and was not merchantable because it was not fit to pass in the trade as

advertised.

93. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it was nutritionally appropriate for a child between twelve and twenty-four months, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

94. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

95. Defendant had a duty to truthfully represent the Product, which it breached.

96. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in the field of baby and infant formula products.

97. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

98. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

99. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

100. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce, and did induce, their purchases of the Product.

101. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

102. Defendant misrepresented and/or omitted the attributes and qualities of the Product.

103. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

104. Defendant knew of the issues described here yet did not address them.

105. Defendant's fraudulent intent is evinced by careful labeling to make it appear that the Gerber Good Start Grow was a product line "extension" of its infant formula product, and shared attributes such as its approval by federal regulators for the needs of the age group it was marketed towards.

Unjust Enrichment

106. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: June 14, 2022

                                            Respectfully submitted,

                                            /s/Spencer Sheehan
                                            Sheehan & Associates, P.C.
                                            Spencer Sheehan
                                            60 Cuttermill Rd Ste 412
                                            Great Neck NY 11021
                                            Tel: (516) 268-7080
                                            spencer@spencersheehan.com